## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TROY KARPOVICH, as guardian of
MICHAEL R. KARPOVICH, a legally-
incapacitated person,

       Plaintiff,                      Case No. 18-

                                        Hon.

v.

CITY OF DETROIT, a municipal corporation,
JAMES E. CRAIG, in his official capacity,
DETROIT BOARD OF POLICE COMMISSIONERS,
TIMOTHY L. LEACH, FREDERICK E.
PERSON, DETROIT POLICE OFFICERS
JOHN DOES 1 – 5, in their individual and
official capacities, TIMOTHY L. LEACH
d/b/a T. LEACH ENTERPRISE, and
EIGHTH STREET VENTURES, LLC,
d/b/a Ottava Via,

          Defendants.

**REQUEST FOR JURY DEMAND**

_____/

JENNIFER G. DAMICO (P51403)
MIKE MORSE LAW FIRM, P.L.L.C.
Attorneys for Plaintiff
24901 Northwestern Highway, Suite 700
Southfield, Michigan 48075
(248) 350-9050
Fax: (248) 281-9110
jdamico@855mikewins.com

_____/

## COMPLAINT

NOW COMES Plaintiff, Troy Karpovich, as guardian of Michael R. Karpovich, a legally-incapacitated person through his attorneys, Mike Morse Law Firm, P.L.L.C., and for his Complaint against the above-named Defendants, states as follows:

1.     This is a civil action for money damages brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution against Defendants, City of Detroit, Detroit Board of Police Commissioners, James E. Craig, Timothy L. Leach, Frederick E. Person, Detroit Police Officers John Does 1 through 5, in their official and individual capacities, Defendant, Eighth Street Ventures, LLC, d/b/a Ottava Via, and state law claims against all Defendants.

2.     This court has jurisdiction over Plaintiff's 42 U.S.C. § 1983 claims presented in this Complaint based upon the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343.

3.     This court has jurisdiction over Plaintiff's state law claims pursuant to Federal Rule of Civil Procedure 18 and 28 U.S.C. § 1367.

4.     Venue lies in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b).  The unlawful actions alleged in this Complaint took place within the City

of Detroit in Wayne County, located within the Southern Division of the Eastern District of Michigan.

5.     The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest, costs and attorney fees.

### PARTIES

6.     Plaintiff, Troy Karpovich, as guardian of Michael R. Karpovich, a legally-incapacitated person ("Plaintiff" hereinafter shall mean Michael R. Karpovich), is and at all times relevant to this action was, a resident of the State of Michigan.

7.     Defendant, City of Detroit ("City"), is a Michigan municipal corporation and is the body responsible for the control and oversight of its departments, agencies and facilities including the Detroit Police Department, as well as its sworn police officers, including but not limited to: Defendants, James E. Craig, Timothy L. Leach, Frederick E. Person, and Detroit Police Officers John Does 1 through 5.

8.     Defendant, Detroit Board of Police Commissioners ("BOPC"), at all times relevant to this action was, the governing body within the executive branch of the City, that has supervisory control and oversight of the Detroit Police Department, and is the final authority in imposing and/or reviewing discipline of employees of the Department.

9.     Defendant, James E. Craig ("Craig"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Craig is sued in his official capacity as the Chief of the Detroit Police Department, and final policy-maker, employed by the Defendant City and/or the Detroit Police Department ("DPD" or "Department" hereinafter).

10.     Defendant, Timothy L. Leach ("Leach"), is and at all times relevant to this action was, a resident of the State of Michigan.  On March 11, 2018, Leach was the Commander of the 11th Precinct of the DPD, therefore, the supervisor of his fellow officers, Person and/or Defendants John Does 1 through 5.  Defendant Leach was in the scope of his employment and is being sued in his individual and/or official capacity.

11.     Defendant, Frederick E. Person ("Person"), is and at all times relevant to this action was, a resident of the State of Michigan.  On March 11, 2018, Person was a DPD Detective.  Defendant Person was in the scope of his employment and is being sued in his individual and/or official capacity.

12.     Defendants, Detroit Officers, John Does 1 through 5 ("Officers Does"), whose identities shall become known through the course of discovery, are and at all times relevant to this action were, residents of the State of Michigan.  Officers Does are being sued in their individual and/or official capacities.

13.     Defendants, Leach, Person, and Officers Does, were at all times relevant to this action, employed as law enforcement officers by the City and/or DPD, and were acting under the color of state law in their capacities of DPD police officers.

14.     Defendant, Timothy L. Leach d/b/a T. Leach Enterprise ("Leach Enterprise"), is and at all times relevant to this action was, a resident of Michigan, and sole owner of Leach Enterprise, a security consulting firm that, upon information and belief, regularly employed, hired, supervised and/or retained DPD police officers, to perform crowd control services, among other things, pursuant to the City's "Off-Duty Outside Employment" policy.[1]

15.     Defendant, Eighth Street Venture, LLC, d/b/a Ottava Via ("Ottava Via"), is, and at all times relevant to this action was, a Michigan limited liability corporation, doing business as Ottava Via, a restaurant located at 1400 Michigan Avenue, Detroit, Michigan 48216, and, upon information and belief, one of the limited partners and/or investors is a former DPD commander, Dennis Fulton.

---

[1] DPD Policy Directive, 102.3 CODE OF CONDUCT, 102.3-8 OFF DUTY EMPLOYMENT.

## GENERAL ALLEGATIONS

16.     In December of 2000, the United States Department of Justice ("DOJ") initiated an investigation into the use of force by the DPD, and conditions in DPD holding cells pursuant to federal law.

17.     With respect to the DPD's use of force policies and procedures, on March 6, 2002, the DOJ issued its "Detroit Police Dept. Use of Force Findings Letter," where it found blatant deficiencies in the DPD's use of force and use of force reporting, external complaints, internal investigations, supervisory oversight, discipline and training.[2]

18.     As a result of its investigation, the United States of America filed a complaint against the City and the DPD seeking "declaratory and equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges or immunities secured by the Constitution or federal law."[3]

19.     On June 12, 2003, the City entered into two Consent Judgments ("Consent Decree" or "Agreement" hereinafter), thereby agreeing that it engaged in a pattern and/or practice of unconstitutional and unlawful conduct "made possible

---

[2] Letter from Steven H. Rosenbaum, Chief Special Litigation Section and Jeffrey G. Collins, United States Attorney, Eastern District of Michigan, to Ruth Carter, Corporation Counsel, City of Detroit (Mar. 6, 2002).

[3] June 12, 2003 Consent Judgment, *United States of America v. City of Detroit, et al.,* ¶ II.2. (E.D. Mich., Case No. 03-72258).

by the failure of the City of and the DPD to adopt and implement proper management practices and procedures.[4]

20.    The Consent Decree identified four (4) failures in the DPD's customs, policies and/or practices as the major causes of the violations of citizens' Constitutional rights: 1) excessive use of force; 2) failure to document, investigate and review complaints by citizens; 3) unlawful and/or inadequate arrest and detention policies and practice; and 4) failure to manage, train and supervise officers.[5]

21.    In addition to training and policy development, the DPD was required to develop and maintain a risk management data base (later known as the "Management Awareness System" or "MAS") designed to track the use of force review process from the initial report through the final review of the incident.  The database was supposed to be capable of: 1) in-taking and tracking external citizen complaints, including all complaint investigations, and results of the investigation; 2) tracking complaints against individual officers, including use of force incidents, use of force investigations, any disciplinary incidents or policy violations; 3) allowing supervisors to input subordinate disciplinary incidents or violations 4) inputting and tracking individual officers' field training and other continuing

---

[4] *Id.* at ¶II.3.
[5] *See,* Consent Decree, generally.

training and/or education; and 5) tracking all crime statistics in the City as required by federal law.[6]

22.     The Consent Decree also mandated that the DPD use the data from the risk management database to identify an officer or a group of officers to evaluate and/or assess for "at-risk" behavior as a means of preventing future unconstitutional violations and/or unlawful conduct against citizens; a key component in the DPD's review and oversight process.

23.     In order to satisfy the terms of the 154-paragraph Agreement, a federal monitor ("Monitor") was appointed to implement it.

24.     Specifically, a substantive part of the Monitor's role was to prepare "quarterly reports" for the parties and the court providing a status on the City's progress.

25.     Paragraph 148 of the Consent Decree states: "[t]he Agreement shall terminate five years after the effective date of the Agreement if the DPD and the City have substantially complied with each of the provisions of this Agreement and have maintained compliance for at least two years."

26.     Had the City and DPD "substantially complied" with all the provisions of the Agreement, they would have been free from federal oversight by June of 2008; subject to the two-year provisional period of compliance.

---

[6] Consent Decree, ¶IV.80.

27.     The Consent Decree was not terminated (or "lifted" as commonly stated), until 2014; making it the second-longest such undertaking by the Justice Department.[7]

28.     Former DPD police chief, Chester L. Logan, attributed the delay in implementation due to "pushback from the rank and file."[8]

29.     As mandated by the Consent Decree, the DPD revised its use of force policies, practices and procedures.  The revisions were codified in its policy manual as Directive Number 304.2 – USE OF FORCE (commonly referred to as the Department's "General Orders"), and it became effective on August 6, 2014.

30.     General Order 304.2-2 POLICY, states, in pertinent part:

> Officers who use excessive force or an unauthorized use of force shall be subjected to discipline, possible criminal prosecution, and/or civil liability.  Use of force is only authorized when it is objectively reasonable and for a lawful purpose.
>
> \*       \*       \*       \*       \*
>
> Following any use of force resulting in a citizen's injury, officer shall notify a supervisor and ensure that appropriate medical aid and/or medical service is rendered as soon as possible.
>
> \*       \*       \*       \*       \*
>
> Use of force is lawful if it is **objectively reasonable** under the circumstances, and the minimum amount of force that is necessary to affect an arrest or protect the officer or other person is used.

---

[7] www.pbs.org/wgbh/frontline/article/what-happens-when-police-are-forced-to-reform/ (Nov. 13, 2015).
[8] *Id.*

31.     In addition to the policy, General Order 304.2 mandates reporting of use of force incidents, as codified in sections 304.2-7.1 Use of Force Reporting and 304.2-7.2 Use of Force Report.

32.     These sections state, in relevant part, that upon an *any* use of force injury, an officer *shall:*

- Notify their Zone Supervisor;
- The Zone Supervisor shall notify a non-involved sworn supervisor;
- The sworn supervisor shall respond to the scene of the incident on a priority basis;
- The supervisor shall interview the officer(s), canvass for witnesses, and examine the subject for injury, and ensure that the subject(s) receive medical attention;
- The supervisor shall notify Internal Affairs ("IA") of all serious uses of force, uses of force that result in a visible injury, uses of force that a reasonable officer should have known were likely to result in injury, and uses of force where there is evidence of possible criminal misconduct by an officer; and
- Internal Affairs shall respond to the scene and investigate all incidents where there is evidence of possible criminal misconduct by an officer, . . . or where there is a serious use of force.
- The officer shall also complete a Use of Force Report (UF-002).[9]

33.     The Monitor drafted nineteen (19) quarterly reports ("Reports").  In the Nineteenth Report, dated July 14, 2014, the Department was ***not*** in compliance with

---

[9] DETROIT POLICE DEPARTMENT MANUAL, Chapter 304 – Use of Force, Directive Number 304.2, effective 8/6/14.

the following requirements of the Consent Decree and the its Revised Use of Force

Policy:

- U28 - Investigation by uninvolved supervisor
- U29 - Procedures for investigative interviews
- U32 - Revise investigatory report policies
- U36 - Completion of command investigations
- U38 - Protocol for critical discharge investigations
- U33 - Chain of command reviews
- U40 - Review critical firearm discharges
- U45 - Written account of stops and frisks
- U60 - Required review of violations
- U101 – Revision of video camera policy
- U102 -  Record all vehicle stops, searches, etc. [10]

34.    The Monitor, Robert S. Warshaw, wrote: "[t]he collection of non-compliant requirements indicates that the Department continues to falter in its ability to consistently and carefully conduct internal investigations, and to learn to reform its practices based on the results.  We regard these as essential elements for achieving – and sustaining – progress in the Department."[11]

35.    On August 13, 2014, Robert S. Warshaw sent his Final Report to United States District Court Judge Avern Cohn "on the status and history of the Detroit Police Department Use of Force Consent Judgment case." [12]

---

[10] NINETEENTH QUARTERLY REPORT, Independent Monitor for the Detroit Police Department, p. 10 (Jul. 14, 2014).
[11] *Id.* p. 12.
[12] Letter from Chief (Ret.) Robert S. Warshaw, Monitor, to The Hon. Avern Cohn, USDC Judge, Eastern District of Michigan (Aug. 13, 2014).

36.     In the Final Report, the Monitor noted that in the past 12 years of oversight, the Department only recently became compliant in 90% of the requirements of the Judgement, and that the 10% in which it was non-compliant were major core requirements relating the use of force.  The Monitor wrote: "[t]he status of compliance with the above-described Judgment requirements is troublesome, not merely due to the lack of compliance with the Judgment, but more due to the lack of adherence to contemporary police practices.  It is disappointing that the DPD, after over 12 years of working to modify its investigative practices to comport with contemporary policing practices, has not done so."[13]

37.     While the Department was permitted to enter the transition period, it never satisfied the requirements of the Consent Decree nor remedied the areas for which it was non-compliant as stated in ¶32.

38.     Moreover, once federal oversight was eliminated, the DPD did not enforce its newly-created use of force policies and procedures thereby reverting back to and/or never rectifying its custom, policy and practice of unconstitutional policing.

39.     Specifically, the Department did not enforce General Order 304.2-2 USE OF FORCE POLICY, including, 304.2-7.1 Use of Force Reporting and 304.2-7.2 Use of Force Report.

---

[13] USE OF FORCE CONSENT JUDGMENT FINAL REPORT, pp. 17-18 (Aug. 13, 2014).

40.     While the DPD had a policy regarding the use of force, including the reporting and investigation of use of force incidents, and disciplinary action against officers involved in excessive use of force incidents, its policy was so obviously toothless and ineffective that it encouraged DPD officers in the belief that they could abuse citizens with impunity.

41.     On March 31, 2016, the Transition Agreement between the United States and the City of Detroit was terminated.

42.     Since the DPD has been self-regulating, the final policy-makers, including Chief Craig have turned a blind-eye to incidents of brutality, patterns of abuse, refusing to punish, discipline, and/or terminate offenders, refusing to enter and process data into the MAS system, refusing to wear body cameras, and refusing to produce accurate use of force statistics, thereby passively encouraging a culture of silence in the face of abuse perpetrated upon citizens.

43.     In August of 2015, three (3) off-duty DPD officers fired more than a dozen shots at Demar Parker, hitting him once in the leg, as he was fleeing the scene to get out of harm's way.  One of the officers was Parker's rival love interest.  The other was officer Jerold Blanding; an officer who should have been flagged by the MAS system if the DPD was using it as intended.  Parker was never charged with a crime.  The three officers denied that they injured Parker, even after internal affairs officers took statements from Parker in the hospital.  Despite their unlawful conduct,

the officers were not suspended and remained on the force with full pay.  The internal investigation continued for over one year, and Defendant, BOPC, the final authority in imposing and reviewing discipline of employees, found that the officers did not violate DPD policy.

44.     Officer Jerrold Blanding was the officer who fired the bullet into Parker's leg.  In his 22 years on the force, Blanding, had numerous incidents where he used excessive force and engaged in unlawful and unconstitutional policing.

45.     In one incident, again off-duty, Blanding repeatedly shot a man after he accidently entered the wrong vehicle, Blanding's, after retrieving money from an ATM machine.  Blanding told investigators that he thought the man was an armed robber.  However, a witness corroborated the man's claim that Blanding only started shooting after the man apologized for his mistake and closed Blanding's car door.  Blanding was never charged.  Blanding was never disciplined and remained on the force.

46.     In 1995, Blanding shot a pigeon with his department-issued gun.  While he received a minor reprimand, he remained on the force with full pay and authority.

47.     The City, through its final policy makers, turned a blind-eye to the unlawful and unconstitutional actions of Blanding, thereby ratifying a custom, policy and practice of failing adequately supervise, monitor, discipline, investigate and otherwise control its officers.

14

48.    The City's deliberate indifference to its own policy against the use of excessive force and citizens' constitutional rights lead to the shooting death of 19-year old Raynard Burton on February 13, 2017 by Blanding.

49.    Blanding shot Burton after initially seeing him speed by in a stolen vehicle.  Blanding claims a foot chase ensued; far from view of his DPD cruiser's dash camera.  Blanding shot and killed Burton in alleged self-defense claiming that Burton grabbed for his gun.  Burton was shot at close range in his chest.  There were no eye witnesses.  Blanding was not wearing a body-worn camera.

50.    Blanding, whose Instagram name is "Fatal Force," was not criminally prosecuted due to a lack of evidence.   He remains on the force today on "administrative leave" where he retains his medical benefits.[14]

51.    DPD officers, Richard Billingslea and Hakeem Patterson, are currently defendants in four (4) civil lawsuits by citizens alleging violations of their constitutional rights, namely violations of the 4th Amendment to the Constitution.  Neither officer has been terminated from employment.[15]

---

[14] *See,* Minutes from Detroit Board of Commissioners Regular Meeting, P. 78 (Apr. 26, 2018).
[15] *Parnell v. Billingslea, Patterson, City of Detroit, et al*., USDC Case No. 17-12560; *Craft, et al., v. Billingslea, Patterson, City of Detroit, et al*., USDC Case No. 17-12752; *Wheeler v. Billingslea, Patterson, City of Detroit, et al.,* USDC Case No. 18-103346 and *The Estate of Jackson, et al. v. Billingslea, Patterson, City of Detroit, et al*., Wayne County Circuit Case No. 18-001339-NI.

52.    On June 24, 2015, Billingslea and Patterson, were involved in a high-speed pursuit during which the pair violated numerous DPD policies and procedures.

53.    Billingslea and Patterson unreasonably and unlawfully pursued a vehicle at speeds in excess of 100 m.p.h., in a residential area, bumped the rear-end of the vehicle causing to lose control, strike a minivan, which in turn, stuck and killed two young children.[16]

54.    Despite violating DPD policies on police pursuits and causing the deaths of two small children, Billingslea and Patterson were not terminated suspended, and/or otherwise disciplined, other than a three (3) days suspension for Billingslea.  They remained on the force with full pay and benefits.

55.    Less than fifteen (15) months later, Terry Parnell's constitutional rights were violated by the duo.  Officers Billingslea and Patterson responded to a call of "shots fired" in a residential neighborhood.  On January 14, 2017, Parnell's fiancé told them that she, not Parnell, fired the shots into an abandoned home next door, because she had recently purchased the weapon and was practicing using it.[17]

---

[16] *The Estate of Jackson, et al. v. Billingslea, Patterson, City of Detroit, et al.*, Wayne County Circuit Case No. 18-001339-NI.
[17] *See, generally*, *Parnell v. Billingslea, Patterson, City of Detroit, et al.*, USDC Case No. 17-12560.

56.     Despite being told that Parnell did not fire the shots, Billingslea and Patterson violated the DPD's Use of Force Policy by forcefully restraining Parnell and placing him under arrest without a warrant, justification or probable cause.

57.     Parnell was taken into custody and detained for six (6) days; however, he was eventually released and all charges were dismissed.

58.     On April 18, 2017, the pair violated the constitutional rights of Damian Wheeler.  On that evening, Billingslea and Patterson were at a gas station located at 17046 Harper in Detroit, Michigan.

59.     Mr. Wheeler pulled in to purchase fuel, carrying his legally permitted and concealed firearm.[18]

60.     As Wheeler went into the gas station to pay for his fuel, he cordially said "how are you doing?" to Officer Billingslea.   Suddenly, and without provocation, Billingslea exited his DPD vehicle, grabbed Wheeler by his arm, and restrained him for no reason.

61.     Patterson joined in the arrest and both officers unlawfully drew their firearms on Wheeler, and conducted an illegal search without probable cause.

_____

[18] *Wheeler v. Billingslea, Patterson, City of Detroit, et al.,* USDC Case No. 18-103346.

62.    Billingslea and Patterson continued to push Wheeler in his chest, pushed him against a wall, stating: "you think you hard . . . boss" while pointing their guns at him, placing him in imminent fear of being shot.

63.    Video of the incident captured on the gas station's surveillance cameras, was taken by DPD, and DPD refused to produce it to Wheeler's attorney pursuant to a Michigan Freedom of Information Act request and/or the DPD destroyed the surveillance footage depicting the unlawful and unconstitutional actions of Billingslea and Patterson.

64.    Despite violating DPD policies on arrests, probable cause and excessive use of force, Billingslea and Patterson, were not terminated, suspended, or otherwise disciplined.  They remained on the force with full pay and benefits.

65.    Upon information and belief, no use of force reports were completed by their supervisor as mandated by the DPD's Use of Force Policy as outlined in ¶ 31.

66.    Upon further information and belief, neither this incident, nor the prior incidents, were entered into the MAS database; the database mandated by the Consent Decree that would have "flagged" these two repeat offenders as "at risk" officers.

67.    Six (6) weeks later, on May 31, 2017, Officers Billingslea and Patterson unlawfully attacked D'Marco Craft and Michaele Jackson, at the same gas station.

68.     This time, Craft captured the incident on his mobile phone and local media published the video.[19]

69.     Craft had many run-ins with both officers at this gas station as they were known to sit in their patrol car and harass patrons,

70.     On this occasion, the officers followed Craft into the station and verbally harassed him.

71.     Billingslea caused physical contact between himself and Jackson by putting himself in front of Jackson as he tried to enter.

72.     Once contact was made, Billingslea and Patterson threw Jackson to the ground forcefully, face-first.

73.     Billingslea took a break from assaulting Jackson when he realized that Craft was recording the incident with his cell phone.

74.     As Billingslea began yelling and threatening Craft, Jackson stood up and went into the gas station.  Billingslea following him in and confronted him a second time.  Patterson followed behind.

75.     Jackson was in the process of trying to purchase cigarettes and was not posing a threat to anyone nor was he committing a crime.

---

[19] *Craft, et al., v. Billingslea, Patterson, City of Detroit, et al*., USDC Case No. 17-12752.

76.     Billingslea retrieved mace from his holster and sprayed it directly into Jackson's eyes, in clear violation for the DPD's Use of Force policies and procedures.

77.     Both officers continued to use excessive force and assault Jackson after he was sprayed with mace.

78.     Craft continued to record the unlawful assault and battery.

79.     Billingslea and Patterson, knowing that Craft had recorded their criminal actions, threatened to arrest him if he did not give them his cell phone.

80.     Billingslea and Patterson then took Craft's cell phone "to place in evidence" without a warrant and any lawful basis.

81.     Both Billingslea and Patterson lied in the reporting of the incident to DPD.

82.     Billingslea and Patterson's supervisors violated the Use of Force Policy with respect to reporting, discipline and training.

83.     Upon information and belief, no use of force reports were completed by Billingslea and Patterson's supervisors as mandated by the DPD's Use of Force Policy, among other things, as outlined in ¶ 32.

84.     Upon further information and belief, this incident was not entered into the MAS database.

85.     In all four (4) incidents, occurring from 2015 through 2017, Billingslea and Patterson violated the DPD's Use of Force Policy and the DPD failed to report, investigate, train, discipline, supervise, input data into the MAS system, and identify abusive unlawful officers, thereby demonstrating deliberate indifference to a clear and persistent pattern of unlawful conduct, namely the excessive use of force against citizens by the DPD.

86.     Upon information and belief, Patterson has never been suspended and/or disciplined and remains on the force today.

87.     On October 8, 2017, DPD officer Lonnie Wade, assigned to the 11th Precinct, under the control and supervision of Defendant Leach, was working off-duty at Meijer as a security guard pursuant to the DPD's Secondary Employment Program.

88.     On that same date, Wade unlawfully beat David Bivins with his baton. The incident was captured on surveillance video.

89.     Upon information and belief, Wade's supervisor, Defendant Leach, violated the DPD's Use of Force Policy as outlined in ¶32, General Allegations, by failing to report, train, monitor, supervise, investigate and/or discipline Wade.

90.     The DPD, through Craig, its final policy-maker, initially justified the excessive of use force, even though it was clear that level of force was objectively unreasonable, unlawful and unconstitutional.

91.     The City, through its final policy-maker, the BOPC, merely placed on administrative duty with full pay on January 4, 2018.[20]

92.     On November 9, 2017, DPD officers from the 11th precinct, under the supervision and control Defendant Leach, were involved in an altercation with DPD officers from the 12th precinct during an alleged undercover "drug bust."  Neither squad was aware that the other was DPD officers.  This incident, captured on a 7-minute video, shows the officers from the 11th precinct, wielding shot-guns, not identifying themselves as officers, screaming profanities, and pointing their guns at the backs of the other officers' heads.  The officers from the 12th precinct identified themselves as "cops" and were told to "shut the fuck up" by officers from the 11th precinct.  During the video, the following transpires between officers from the 11th and 12th precincts:

> 12th:     "You put a gun in my face. Fuck you!"
> 11th:     "We didn't know you were police goddamit! Why would I pull a fucking gun on you if I knew you were police?"
> 12th:     "Why you putting a gun on the regular people for? That's what the fuck's wrong with you all."[21]

93.     One of the officers from the 12th precinct was injured during the incident.

---

[20] *See,* Minutes from Detroit Board of Commissioners Regular Meeting, P. 37 (Jan. 4, 2018).

[21] www.deadlinedetroit.com/articles/18785/leduff (November 20, 2017).

94.     The officers from the 11th precinct, under the supervision and control of Defendant Leach, violated numerous DPD policies and procedures, including General Order 304.2 Use of Force.

95.     Additionally, the wielding of a fire arm without justifiable cause is unlawful and contrary to department policy.

96.     While Defendant Craig called for a full investigation, upon information and belief, no disciplinary action was taken against any of the officers involved in the incident.

97.     While Defendant Craig called the incident "embarrassing," and stated that the supervisor (Defendant Leach) mishandled the incident, upon information and belief, no Use of Force Report was generated by any of the officers involved in the incident, and none of the officers were added to the MAS database or "flagged" as an officer who has engaged in conduct that violates DPD policies and procedures.

98.     Defendant Leach, as the Commander of the 11th precinct, upon information and belief, violated DPD policies and procedures by failing to investigate, report, discipline, and/or train officers under his command.   No disciplinary action was taken against Leach by Defendants City, Craig or BOPC.

99.     While under Defendant Leach's control, as then Commander, a desk sergeant at the 11th Precinct was accused of sexually assaulting a woman at her house after she had come into the precinct to check on the status of an unrelated matter.

100.   This criminal assault, which allegedly occurred in early March of 2018, is the subject of an Internal Affairs investigation only.  The desk sergeant, upon information and belief, remains on duty and receiving full pay and benefits.

101.   Defendant Leach, as the Commander of the 11th precinct, upon information and belief, violated DPD policies and procedures by failing to investigate, report, discipline, and/or train officers under his command, regarding this alleged sexual assault.

102.   The Defendants, City, Craig and BOPC's tacit approval of the unconstitutional conduct of the above-referenced officers, including Defendant Leach, prior to, and since the termination of the Consent Decree, by its failure to report, investigative and/or discipline excessive use of force incidents, clearly amounts to an official policy of inaction.[22]

103.   The Defendants, City, Craig and BOPC's customs, policies and/or practices of failing to report, investigate, discipline, supervise, monitor and otherwise control its officers who use excessive force demonstrates deliberate indifference to the constitutional rights of citizens and that custom, policy and practice was the moving force behind the above-referenced citizens' and Plaintiff's constitutional violations and damages as more fully explained herein.

---

[22] *See, Leach v. Shelby County Sheriff,* 891 F.2d 1241 (6th Cir. 1989); *Marchese v. Lucas,* 758 F. 2d 181 (6th Cir. 1985); *Dyer v. Casey*, 1995 U.S. App. LEXIS 37942, No. 94-5780, 1995 WL, at *2 (6th Cir. Dec. 4, 1995).

## SPECIFIC ALLEGATIONS

104.   On March 11, 2018, Plaintiff and four friends, attended the 60th Annual St. Patrick's Day Parade in the CorkTown neighborhood, in Detroit, Michigan, featuring tailgating, costumes, a race and beer tents, bars and restaurants opening to the public at 7:00 a.m.

105.   Defendant, Ottava Via, an Italian restaurant, located on the parade route, at the corner of 8th Avenue and Michigan Avenue, participated in the festivities, hosting a party that day entitled "Let's Get Ready To Stumble," complete with an outdoor "beer garden" open to the public.

106.   Upon information and belief, one of Defendant, Ottava Via's limited partners and/or investors is retired DPD Commander, Dennis Fulton.

107.   Upon further information and belief, the "head of security" at Ottava Via is Abdullah Muhammad, aka Carlos Harris, aka "Q", a convicted felon; currently serving probation for aggravated stalking, among other things.

108.   Upon information and belief, Defendant, Ottava Via, hired, retained and/or employed Defendants, Leach, Person, Officers Does and/or Leach Enterprise, to provide door man, crowd control services and management, for its party.

109.   Upon information and belief, Defendants, Leach, Person, Officers Does and/or Leach Enterprise, drove department-issued vehicles and/or carried

department-issued equipment to Defendant, Ottava Via on March 11, 2018, including, but not limited to, their badges and service firearms.

110. Upon information and belief, Defendant Ottava Via knew that it was hiring "Detroit Cops" to perform doorman duties, crowd control management, among other services, during its party, giving its employees and patrons a heightened sense of security in that the Detroit Police was already on the scene ensuring their safety.

111. That employees of Defendant, Ottava Via, listened to, took direction from, and deferred to the instructions of Defendants Leach, Person, and/or Officers Does as police officers, acting under the color of law.

112. Upon information and belief, Defendants, Leach, Person, Officers Does and/or Leach Enterprises had been hired, retained and/or employed by Defendant, Ottava Via, on prior occasions, to perform the same or similar services.

113. Upon information and belief, former DPD Commander, Brian Stair, the husband of the First Assistant Chief of the Detroit Police Department, Lashinda Stair, on prior occasions, worked for and/or was employed by Leach Enterprise providing crowd control management and security services.

114. Upon information and belief, Defendants Leach, Person, Officers Does and/or Leach Enterprises were approved by Craig and/or the First Assistant Chief of Police, Lashinda Stair, to work off-duty and/or outside employment.

26

115.   Upon information and belief, Defendant Leach had received approval from Craig and/or First Assistant Chief of Police, Lashinda Stair, to engage in off-duty or outside employment to perform crowd control management during festivals, and during the Annual St. Patrick's Day Parade, on prior occasions, pursuant to General Order 102.3-8 Off Duty Employment.[23]

116.   Upon information and belief, Defendant Craig, had knowledge that Defendants, Leach, Person, Officers Does and/or Leach Enterprise, were engaging in off-duty or outside employment ("outside employment" hereinafter) pursuant to General Order 102.3-8.[24]

117.   That during the performance of outside employment, Defendants Leach, Person, Officers Does and/or Leach Enterprises, were acting in their individual and/or official capacities and under the color of state law as DPD police officers.[25]

---

[23] DETROIT POLICE DEPARTMENT MANUAL, Chapter 102 – Code of Conduct, Directive Number 102.3, effective 5/24/16.

[24] Craig has given different statements to the media.  When the story first came to light, he stated that he would not approve outside employment where alcohol is served.  Later, in a statement to the press, he said that he *generally* does not like officers to moonlight in bars, stating: "It's just not a good idea." Presumably, when his staff informed him that approval is routinely given for officers to work parades and festivals where alcohol is served, he revised his prior statements and said that Leach did not have permission to work outside employment at all.  Finally, Craig told the press that while Leach had approval at one time, his approval had "expired."

[25] General Order 102.3 Code of Conduct governs a sworn DPD officers' conduct while on and *off duty.*

118.   At Ottava Via, at approximately 3:30 p.m., based upon information and belief, Leach attempted to escort Plaintiff, who was visibly intoxicated, out of the restaurant, after Plaintiff was involved in a verbal, non-physical dispute with another patron.

119.   Witnesses at the restaurant saw Leach and unidentified Defendant, Officers John Does, and/or employees of Defendant, Ottava Via, drag Plaintiff from the back hallway of the restaurant into the main dining room.

120.   Defendant Leach then pushed Plaintiff backwards using hard hands on Plaintiff's chest.[26]

121.   Plaintiff stumbled but regained his balance and composure.

122.   Plaintiff did not fight back, strike, provoke, assault or otherwise attack Leach or any other Defendant.

123.   No reasonable officer would determine Plaintiff was able to cause any physical harm to Defendants and/or any patron or the general public, i.e., Plaintiff did not pose an "imminent threat."

124.   Plaintiff was defenseless.

---

[26] General Order 304.2-3.7 Hard Hands – Using physical pressure to force a person against an object or the ground, or the use of physical strength or skill that causes pain or leaves a mark.

28

125.   Defendant Leach then used both arms, with his full body weight, and shoved Plaintiff in the chest with such force, that witnesses said that Plaintiff's body became airborne.

126.   Plaintiff fell backwards, slamming the back of his head on the concrete dining room floor.

127.   While Plaintiff lay on the floor bleeding profusely from his head, instead of rendering first aid, Defendant Leach grabbed Plaintiff's arms, pulled them over his head and attempted to drag him out of the restaurant through the front door, causing additional, life-threatening injuries to Plaintiff.

128.   Defendant Leach only stopped dragging Plaintiff when a female patron grabbed his arm and yelled at him to stop.

129.   Defendant Leach did not in any way attempt to help Plaintiff and/or render any medical treatment.  He merely walked to the back of the restaurant and, upon information and belief, began making telephone calls and/or sending text messages in an attempt to cover-up his criminal actions.

130.   As Plaintiff laid on the ground bleeding from his obvious head wound, witnesses described him as "gurgling", his eyes "rolling back in his head" and "being in and out of consciousness."

131.   Several patrons called "911" for emergency medical assistance.

132.   Upon information and belief, at least one 911 caller reported the incident to the DPD dispatcher as an "assault."[27]

133.   None of the Defendant police officers, trained in basic life support, provided any assistance to the Plaintiff, in violation of General Order 102.3, Code of Conduct and the Use of Force Policy.

134.   After the unlawful attack, but before emergency medical technicians arrived on the scene, Defendants, Leach, Person, Officers John Doe and/or Defendant, Ottava Via, engaged in a plan to conspire, lie and/or deceive, namely: that Plaintiff slipped and/or tripped and fell and struck his head on the concrete floor.

135.   The Defendants acted in concert and actively engaged in a conspiracy to lie, cover-up, falsify and/or tamper with evidence in an attempt to prevent the discovery of the horrific attack and clearly excessive use of force perpetrated by the Defendant police officers and/or employees of Defendant, Ottava Via.

136.   Upon information and belief, Defendant Person lied to fellow DPD patrol officers who arrived at the scene in response to one of the many "911" calls, stating that Plaintiff had merely fallen and hit his head.  Defendant Person, a detective, commanded the lower-ranking patrol officers to leave the scene and that they were not needed.

---

[27] Detroit Open Data Portal, 911 Calls for Service, Incident ID: 201807001951 (Mar. 11, 2018)  https://data.detroitmi.gov/d/fvu3-6/visualization.

137.   Upon information and belief, Defendants, Leach, Persons, Officers Does and/or Defendant, Ottava Via, then instructed restaurant employees to draft written statements in furtherance of the conspiracy and cover-up stating the Plaintiff tripped and/or slipped and fell and hit his head.

138.   Upon information and belief, Defendants, Leach, Persons, Officers Does, and/or employees of Defendant, Ottava Via, erased, deleted and/or destroyed text and/or voice messages and data from their department-issued and private telephones that contained evidence of their conspiracy to cover-up the unlawful attack of Plaintiff.

139.   Upon information and belief, Defendants, Leach, Persons, Officers Does, and/or employees of Defendant, Ottava Via, attempted to commandeer and erase the cell phone videos of restaurant patrons that captured the unlawful attack.

140.   Defendant, Ottava Via, through its employees, agents and representatives, lied to investigators claiming that a video of the incident did not exist.

141.   Defendant, Ottava Via, through its manager, Jorge, lied to Plaintiff's family and friends stating that he had tripped, struck his head causing his injuries.

142.   Upon information and belief, Defendants, Leach, Persons, and Officers Does and/or Defendant, Ottava Via's delay in obtaining emergency medical treatment to Plaintiff caused further damages to Plaintiff.

143.   Plaintiff was transported to Detroit Receiving Hospital by Hart Medical Services.

144.   The emergency department trauma record entered approximately ten (10) minutes after Plaintiff's arrival notes the "mechanism of injury" as "Blunt Assault" and not a fall.

145.   Upon information and belief, a DPD squad car went to Detroit Receiving Hospital on the evening of the assault to ascertain the condition of Plaintiff, refuting Defendant Craig's statements to the media that the DPD's first notice of this assault was Wednesday, March 14, 2018.

146.   Upon information and belief, the cover-up of this crime began on March 11, 2018.

147.   Upon information and belief, Internal Affairs ("IA") began an "investigation" into the incident on or about March 11, 2018; not on March 14, 2018 as stated by Defendant Craig in numerous media reports.

148.   On March 12, 2018, after contacting Plaintiff's friends, Troy Karpovich located his brother in the ICU unit at Detroit Receiving Hospital.   The nurse informed Troy Karpovich that a "bouncer" threw him out and caused his injuries.

149.   On March 13, 2018, Troy Karpovich called Ottava Via and spoke to the manager, Jorge.  Jorge confirmed that an incident occurred at Ottava Via, but "Mike

slipped and fell" causing his injuries.  Jorge volunteered that "they have witness statements."

150.   That same day, Troy Karpovich called the DPD crime reporting "hotline" to report the assault upon his brother.[28]  He was told by the DPD employee on the "hotline" that he was "speculating" and his information was "hearsay."

151.   Defendant DPD refused to acknowledge this external complaint and take a report regarding this assault, in violation of the City's Charter; a fundamental requirement of the Consent Decree.[29]

152.   On March 13th and 14th, Troy Karpovich made several more attempts report the incident to the DPD to no avail.

153.   On March 14, 2018, Troy Karpovich called a second DPD crime reporting number.  A report was finally taken.

154.   Upon information and belief, Defendants, Leach, Persons, and/or Officers Does failed to report the use of force to their department supervisors, failed to complete the mandatory use of force report, actively engaged in a conspiracy to hide the attack, and lied to the subsequent investigating authorities.

155.   While the matter was initially investigated by Internal Affairs ("IA"), the DPD, through its final policy-maker, Defendant Craig, failed to properly

---

[28] (313) 596-2200.
[29] CHARTER OF THE CITY OF DETROIT, SEC. 7-808 (JAN. 1, 2012); *See,* Consent Decree, *generally.*

investigate, discipline, monitor, supervise and/or otherwise control its officers, including IA.

156.   Upon further information and belief, IA mishandled the investigation and lied and/or failed to disclose findings to the Michigan State Police and other law enforcement agencies.

157.   A special task force, the Homicide Task Force, took over the investigation on March 14, 2018, after the mishandling by IA.[30]

158.   Upon conclusion of the Homicide Task Force's investigation, Defendants, Leach and Person, were criminally charged by the Wayne County Prosecutor.  Defendant Leach was charged with: Assault to do Great Bodily Harm (ten-year felony), Aggravated Assault (one year misdemeanor), Neglect of Duty (one year misdemeanor), No License Security Guard (four-year felony) and Tampering with Evidence (four-year felony).  Defendant Person was charged with: Obstruction of Justice (five-year felony), Neglect of Duty (one-year misdemeanor) and Tampering with Evidence (four-year felony).[31]

---

[30] The source of this allegation comes from meetings with the Homicide Task Force.  Notably, the City essentially refused to comply with Plaintiff's FOIA requested.  In customary fashion, the City replied that it would cost Plaintiff $12,353.62 and take 267 hours of staff time to respond to the request for information.

[31] May 31, 2018 Press Release, Wayne County Prosecutor's Office.

159.   Despite being charged with felonies, Defendants, BOPC, refused to suspend Defendants, Leach and Person *without* pay, thereby encouraging, cultivating and ratifying the conduct (i.e. use of excessive force) that resulted in the violation of Plaintiff's constitutional rights.

160.   Leach and Person are receiving full pay and benefits.

161.   As a direct and proximate result of the wrongful conduct of each of the individual Defendants, Plaintiff has been substantially and irreparably injured. These injuries include, but are not limited to:

a.   Severe traumatic brain injury;

b.   Initial Glascow Coma Score of 3, then 7;

c.   Complex right temporal bone fracture with pneumocephalus;

d.   Left frontal intraparenchymal hemorrhage with diffuse subarachnoid hemorrhage;

e.   Hematoma over left eye;

f.   Unconscious and unresponsive;

f.   Severe increased intracranial pressure requiring an emergency craniectomy to remove a portion of his skull to relieve brain pressure;

g.   Placed into a medically-induced coma after surgery for weeks;

h.   Complications after surgery including epileptic seizures, fever, pneumonia, respiratory failure, urinary tract infections, and muscle wasting;

       i.      Prolonged hospital stay and transfer to inpatient rehabilitation institute;

       j.      Cranioplasty, a second operation to reattach his skull;

       k.     Permanent disfigurement and scarring;

       l.      Persisting neurological damage and sequalae from this traumatic brain injury, the extent of which have not yet been fully ascertained.

162.   As a further direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff has suffered the loss of constitutional and federal rights, physical injuries, impairments and disfigurements, described in detail above, financial and/or economic damages, including loss wages, loss of earning capacity, past, present and future medical expenses, great pain and emotional distress, ongoing damages for medically/psychologically-related treatment caused by the unconstitutional and moving forces concerted conduct of all Defendants.

163.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendants are liable to Plaintiff for all damages allowed under federal law and the Michigan damages statutes.

## COUNT I
## 42 U.S.C. § 1983 – EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS

## (AGAINST DEFENDANTS, LEACH, LEACH ENTERPRISE, PERSON AND OFFICERS DOES)

164. Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

165. At all times relevant, Plaintiff had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including his right to personal safety and bodily integrity, as well as protection from unlawful search, unlawful seizure, unnecessary force, unreasonable force and excessive force pursuant to the Fourth Amendment to the United States Constitution.

166. At all times relevant, as police officers acting under color of law, Defendants were required to obey the laws of the United States including those laws identified under the Fourth and Fourteenth Amendments to the United States Constitution.

167. In violation of Plaintiff's clearly established constitutionally-protected right to be free from excessive force, punishment and deprivation of life and liberty without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendants subjected Plaintiff to an unreasonable seizure, arrest, detention, excessive force; thereby inflicting horrendous personal injuries upon him.

168. In violation of Plaintiff's clearly established constitutionally-protected right to be free from excessive force, punishment and deprivation of life and liberty

without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendants failed to act to prevent an unreasonable seizure, arrest and the use of excessive force against Plaintiff.

169.   During the incident, Defendants further violated Plaintiff's clearly established constitutionally-protected due process rights under the Fourteenth Amendment to the to the United States Constitution, as they were deliberately indifferent to his obvious serious medical need by: 1) dragging him across the restaurant floor after the criminal attack causing further damage; 2) failing to perform basic life support or first aid, in furtherance of their cover-up and in violation of DPD orders; 3) turning away DPD patrol officers who could have rendered assistance;  and 4) preventing restaurant patrons from performing first aid to Plaintiff. All of these actions and/or inactions were done with deliberate indifference to Plaintiff's serious medical need and all in an attempt to prevent themselves from getting caught.

170.   During and after the incident as described above, Defendants conspired with one another and Co-Defendants to lie to law enforcement, to obstruct justice, to hide and destroy evidence, to fail report or document the incident accurately, and to fail to accurately report the incident to medical professionals.

171.   Any reasonable police officer at the time of this incident would have known that violently shoving a defenseless man with such tremendous force causing

his feet to leave the ground, and his head to crash down on the concrete floor, and then by dragging his lifeless bleeding body without rendering medical aid, was illegal, unnecessary and excessive under the same or similar circumstances that existed in this case.

172.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendants are liable to Plaintiff for all damages allowable under federal law and Michigan damages statutes. To the extent that the damages allowable and/or recoverable under one or both statutes are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendants, this Court must order additional damages to be allowed to satisfy any and all such in adequacies.

173.   The conduct of Defendants was and remains extreme and outrageous subjecting Defendants to punitive damages.

174.   As a direct and proximate result of Defendants' violation of Plaintiff's constitutionally-protected rights, Plaintiff has suffered and will continue to suffer damage into the future, including, but not limited to:

a.   Physical pain and suffering;

b.   Permanent scarring;

c.   Mental anguish;

d.   Severe emotional distress;

e.   Fright and shock;

    f.      Denial of social pleasures and enjoyments;

    g.      Humiliation or mortification;

    h.      Reasonable medical bills and expenses for past, present and future;

    i.      Punitive damages;

    j.      Exemplary damages; and

    k.      All other damages properly recoverable under law.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in his favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT II
## 42 U.S.C. § 1983 – DELIBERATE INDIFFERENCE TO UNCONSTITUTIONAL POLICIES, PRACTICES AND CUSTOMS BY SYSTEMATIC FAILURE TO SUPERVISE, MONITOR, TRAIN, INVESTIGATE, REPORT AND DISCPLINCE OFFICERS IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS

### (AGAINST DEFENDANTS, CITY, BOPC AND CRAIG)

175.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

176.   42 U.S.C. § 1983 states:

      Every person, who under the color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to

> be subjected any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of
> any rights, privileges or immunities secured by the
> constitution and law shall be liable to the party injured in
> an action at law, suit in equity, or other appropriate
> proceeding for redress . . .

177.   Defendants, City, BOPC and Craig, the final policy-makers, had an

obligation to supervise, monitor and train its agents and employees, including the

individual Defendants named herein, to ensure that the constitutional rights of

Plaintiff and similarly situated citizens were not violated.

178.   Defendants, City, BOPC and Craig, the final policy- makers, had an

obligation to investigate complaints against its officers and/or discipline its officers

for the use of excessive force, including the individual Defendants named herein, to

ensure that the constitutional rights of Plaintiff and similarly situated citizens were

not violated.

179.   Defendants, City, BOPC and Craig, the final policy- makers, had an

obligation to properly and honestly report crime statistics to federal agencies

including excessive use of force incidents by its officers, to ensure that the

constitutional rights of Plaintiff and similarly situated citizens were not violated.

180.   By inadequately training, supervising, and monitoring its employees,

officers and agents, the Defendants, City, BOPC and Craig, encouraged, cultivated

and ratified the conduct (i.e., excessive use of force) that resulted in the violation of

Plaintiff's constitutional rights.

181.   By failing to investigate complaints against officers, and discipline employees, officers and agents, who use excessive force against citizens, the Defendants, City, BOPC and Craig, encouraged, cultivated and ratified the conduct (i.e., excessive use of force) that resulted in the violation of Plaintiff's constitutional rights.

182.   By allowing officers who have used excessive force and/or committed other constitutional violations against citizens to remain employed, fully compensated, without punishment or repercussions, the Defendants, City, BOPC and Craig, encouraged, cultivated and ratified the conduct (i.e., excessive use of force) that resulted in the violation of Plaintiff's constitutional rights.

183.   Defendants, City, BOPC and Craig, had notice that its employees and officers were engaging in unconstitutional policing, namely using excessive force against citizens, as stated in the General Allegations above.

184.   While Defendants, City, BOPC and Craig, have a use of force policy that on its face, is constitutionally-valid, the failure to report, train, monitor, supervise, investigate and/or discipline their officers, is so wide-spread and ingrained in the Department as to have the force of law.

185.   With deliberate indifference to the rights of citizens to be free from excessive force by the police, Defendants, City, BOPC and Craig, have ongoingly

encouraged, tolerated, ratified and acquiesced to a dangerous environment of police

brutality by:

a.    failing to conduct sufficient training or supervision with
     respect to the constitutional limitations on the use of force;

b.    by failing to adequately punish unconstitutional uses of force;

c.    by tolerating the use of unconstitutional force;

d.    by ongoingly failing to properly or neutrally investigate citizen
     complaints of excessive force;

e.    by tolerating, encouraging, and permitting collusive statements
     by involved officers in such situations;

f.    by allowing officers to remain on the force with full pay and full
     benefits where they have clearly violated DPD policy, federal
     and state law; and

g.    by failing to disclose crime statistics, use of force incidents
     and/or data to the media, public and federal agencies, by citing
     outrageous costs and expenses to produce such documents,
     thereby creating a wall of silence and shielding the Department
     from criticism, lawsuits and further oversight.

186.   Further, while Defendants, City, BOPC and Craig, pursuant to the

Consent Decree, implemented the MAS database, they refuse to properly input, track

and analyze the data that would identify, discipline, retrain and give the Use of Force

policy efficacy.

187.   Defendant Craig's continual attempt to publicly minimize the egregious

behavior of his department and its tolerance to excessive use of force, blaming the

problems on "a few bad apples" is disingenuous considering the plethora of

excessive force incidents since the lifting of the Consent Decree and the fact that the Department was never complaint with the use of force requirements set forth in the Consent Decree.

188.   Defendant, City, BOPC and Craig's policies, practices and/or customs were the moving force in causing Plaintiff's injuries and damages as described herein.

189.   As a direct and proximate result of Defendants' violation of Plaintiff's constitutionally-protected rights, Plaintiff has suffered and will continue to suffer damages into the future, including, but not limited to:

a.   Physical pain and suffering;

b.   Permanent scarring;

c.   Mental anguish;

d.   Severe emotional distress;

e.   Fright and shock;

f.   Denial of social pleasures and enjoyments;

g.   Humiliation or mortification;

h.   Reasonable medical bills and expenses for past, present and future;

i.   Punitive damages;

j.   Exemplary damages; and

k.     All other damages properly recoverable under law.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in his favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

### COUNT III
### 42 U.S.C. § 1983 – CONSPIRACY TO DEPRIVE PLAINTIFF OF CONSTITUTIONAL RIGHTS PURSUANT TO THE FOURTH AND FOURTEENTH AMENDMENTS

### (AGAINST THE INDIVIDUAL DEFENDANTS AND DEFENDANT OTTAVA VIA)

190.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

191.   Defendants, Leach, Person, Leach Enterprise and/or Officers Does, were at all times alleged herein, employed as law enforcement officers by the City and/or DPD, and were acting under the color or state law in their capacities of DPD police officers.

192.   That Defendant, Ottava Via, through its limited partners, investors, owners, employees, agents and/or representatives, including, but not limited to: Dennis Fulton, Jorge (the Manager), and/or Abdullah Muhammad, acted jointly with the individual Defendant DPD officers, and engaged in a plan to conspire, lie and

deceive, namely; that Plaintiff slipped and/or tripped and fell and struck his head causing his injuries.

193.   Upon information and belief, Defendant, Ottava Via, and Defendants, Leach, Person, Leach Enterprise, and Officers Does, reached an agreement to: 1) delay in calling 911 or summoning medical attention, 2) drag Plaintiff to the front of the restaurant in an attempt to throw him out after he was crucially-injured, 3) falsify, tamper and/or destroy evidence; and 4) lie to investigating authorities regarding the incident and the existence of video surveillance.

194.   At all times relevant, Plaintiff had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including his right to personal safety and bodily integrity, as well as protection from unlawful search, unlawful seizure, unnecessary force, unreasonable force and excessive force pursuant to the Fourth Amendment to the United States Constitution.

195.   At all times relevant, as police officers acting under color of law, Defendants were required to obey the laws of the United States including those laws identified under the Fourth and Fourteenth Amendments to the United States Constitution.

196.   In violation of Plaintiff's clearly established constitutionally-protected right to be free from excessive force, punishment and deprivation of life and liberty

without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendants subjected Plaintiff to an unreasonable seizure, arrest, detention, excessive force; thereby inflicting horrendous personal injuries upon him.

197.   In violation of Plaintiff's clearly established constitutionally-protected right to be free from excessive force, punishment and deprivation of life and liberty without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendants failed to act to prevent an unreasonable seizure, arrest and the use of excessive force against Plaintiff.

198.   During the incident, Defendants further violated Plaintiff's clearly established constitutionally-protected due process rights under the Fourteenth Amendment to the to the United States Constitution, as they were deliberately indifferent to his obvious serious medical need by: 1) dragging him across the restaurant floor after the criminal attack causing further damage; 2) failing to perform basic life support or first aid, in furtherance of their cover-up and in violation of DPD orders; 3) turning away DPD patrol officers who could have rendered assistance;  and 4) preventing restaurant patrons from performing first aid to Plaintiff. All of these actions and/or inactions were done with deliberate indifference to Plaintiff's serious medical need and all in an attempt to prevent themselves from getting caught.

199.   During and after the incident as described above, Defendants conspired with one another and Co-Defendants to lie to law enforcement, obstruct justice, hide and destroy evidence, fail to report or document the incident accurately, and fail to accurately report the incident to medical professionals.

200.   Any reasonable police officer at the time of this incident would have known that violently shoving a defenseless man with such tremendous force causing his feet to leave the ground, and his head to crash down on the concrete floor, then dragging his lifeless bleeding body without rendering medical aid, was illegal, unnecessary and excessive under the same or similar circumstances that existed in this case.

201.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendants are liable to Plaintiff for all damages allowable under federal law and Michigan damages statutes. To the extent that the damages allowable and/or recoverable under one or both statutes are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendants, this Court must order additional damages to be allowed to satisfy any and all such inadequacies.

202.   The conduct of Defendants was and remains extreme and outrageous subjecting Defendants to punitive damages.

203.   As a direct and proximate result of Defendants' violation of Plaintiff's constitutionally-protected rights, Plaintiff has suffered and will continue to suffer damage into the future, including, but not limited to:

      a.    Physical pain and suffering;

      b.    Permanent scarring;

      c.    Mental anguish;

      d.    Severe emotional distress;

      e.    Fright and shock;

      f.    Denial of social pleasures and enjoyments;

      g.    Humiliation or mortification;

      h.    Reasonable medical bills and expenses for past, present and future;

      i.    Punitive damages;

      j.    Exemplary damages; and

      k.    All other damages properly recoverable under law.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in his favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT IV
## ASSAULT AND BATTERY

## (AGAINST DEFENDANTS LEACH, LEACH ENTERPRISE, PERSON, OFFICERS DOES AND OTTAVA VIA)

204.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

205.   Defendants made an intentional and unlawful threat or offer to do bodily injury to Plaintiff.

206.   Defendants' threat was made under circumstances that created in Plaintiff a well-founded fear of imminent peril.

207.   Defendants had the apparent present ability to carry out the act if not prevented.

208.   Defendants thereafter did complete the violent process by Defendant Leach using both arms, with his full body weight, and shoving Plaintiff in the chest with such force, that witnesses said that Plaintiff's body became airborne.

209.   Plaintiff fell backwards, slamming the back of his head on the concrete dining room floor.

210.   While Plaintiff lay on the floor bleeding profusely from his head injury, instead of rendering first aid, Defendant Leach then grabbed Plaintiff's arms, pulled them over his head and attempted to drag him out of the restaurant through the front door, causing additional injuries to Plaintiff.

211.   As a direct and proximate result of Defendants' assault and battery of Plaintiff has suffered and will continue to suffer damage into the future, including, but not limited to:

      a.    Physical pain and suffering;

      b.    Permanent scarring;

      c.    Mental anguish;

      d.    Severe emotional distress;

      e.    Fright and shock;

      f.    Denial of social pleasures and enjoyments;

      g.    Humiliation or mortification;

      h.    Reasonable medical bills and expenses for past, present and future;

      i.    Punitive damages;

      j.    Exemplary damages; and

      k.    All other damages properly recoverable under law.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in his favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT V
## FALSE IMPRISONMENT

### (AGAINST DEFENDANTS LEACH, LEACH ENTERPRISE, PERSON, OFFICERS DOES AND OTTAVA VIA)

212.      Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

213.   Plaintiff was forcibly restrained and/or detained by Defendants against his will, and deprived of his personal liberty and freedom of movement.

214.   Defendants intended to deprive Plaintiff of his personal liberty and freedom of movement.

215.   As a direct and proximate result of Defendants' violation of Plaintiff's constitutionally-protected rights, Plaintiff has suffered and will continue to suffer damage into the future, including, but not limited to:

　　　a.      Physical pain and suffering;

　　　b.      Permanent scarring;

　　　c.      Mental anguish;

　　　d.      Severe emotional distress;

　　　e.      Fright and shock;

　　　f.      Denial of social pleasures and enjoyments;

　　　g.      Humiliation or mortification;

　　　h.      Reasonable medical bills and expenses for past, present and

future;

i.      Punitive damages;

j.      Exemplary damages; and

k.      All other damages properly recoverable under law.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in his favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT VI
## GROSS NEGLIGENCE, WILFUL AND WANTON MISCONDUCT

## (AGAINST ALL DEFENDANTS)

216.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

217.   Defendants owed Plaintiff a duty to use ordinary care to ensure his safety and freedom from excessive force, and other harms as described above.

218.   As Plaintiff had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including his right to personal safety and bodily integrity, as well as protection from unlawful search, unlawful seizure, unnecessary force, unreasonable force and excessive force pursuant to the Fourth Amendment to

the United States Constitution, Defendants Leach, Person, and Officers Does are not entitled to qualified immunity.

219.   Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

220.   Defendants' conduct demonstrated a willful disregard for substantial risk to Plaintiff.

221.   Defendants breached their duties owed to Plaintiff and were grossly negligent in that the acts committed by Defendants were done with reckless disregard to Plaintiff's safety, health, constitutional and/or statutory rights, and with substantial lack of concern to whether an injury resulted to Plaintiff.

222.   As a direct and proximate result of Defendants' violation of Plaintiff's constitutionally-protected rights, Plaintiff has suffered and will continue to suffer damage into the future, including, but not limited to:

    a.    Physical pain and suffering;

    b.    Permanent scarring;

    c.    Mental anguish;

    d.    Severe emotional distress;

    e.    Fright and shock;

    f.    Denial of social pleasures and enjoyments;

    g.    Humiliation or mortification;

h.   Reasonable medical bills and expenses for past, present and future;

i.   Punitive damages;

j.   Exemplary damages; and

k.   All other damages properly recoverable under law.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in his favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT VII
## NEGLIGENCE AND/OR GROSS NEGLIGENCE

### (AGAINST DEFENDANT OTTAVA VIA)

223.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

224.   Defendant, Eighth Street Venture, LLC, d/b/a Ottava Via ("Ottava Via"), is, and at all times relevant to this action was, a Michigan limited liability corporation, doing business as Ottava Via, a restaurant located at 1400 Michigan Avenue, Detroit, Michigan 48216, conducts business there and is responsible for hiring, training, retention and/or supervising its employees, including its security and/or crowd control personnel, among other things.

225.   Defendant, Ottava Via, by and through its authorized agents, servants and employees, owed Plaintiff a common law duty to exercise reasonable care in its conduct, acts, and omissions.

226.   Defendant, Ottava Via, by and through its agents, servants and employees, owed a duty of care to its business invitees, including Plaintiff, to obey the common law and ordinances of the City of Detroit and the statutory law of the State of Michigan.

227.   Notwithstanding the duties imposed upon Defendant, Ottava Via, by statute, ordinance, and common law, Defendant, individually, and through its duly authorized agents, servants, and/or employees, did violate said duties and were negligent by committing the following acts of negligence and/or omissions:

     a.    By negligently failing to exercise reasonable care in hiring, retaining and supervising its security and crowd control employees;

     b.    By negligently failing to conduct reasonable background checks on its security and crowd control employees, including but not limited to its own head of security, a convicted felon;

     c.    By negligently training and monitoring its security and/or crowd control employees;

     d.    By negligently giving other restaurant employees, patrons and the general public a false sense of security by having "Detroit Cops" working as security and/or crowd control;

     e.    Through its employees, agents and/or representatives, negligently concealing information from investigating officers as to how the incident occurred;

f.    Through its employees, agents and/or representatives, negligently destroying evidence, including text messages and other cellular telephone records, in an attempt to conceal the facts surrounding the incident;

g.    Through its employees, agents and/or representatives, negligently failing to render first aid and/or call for medical assistance after the incident in an attempt to conceal the facts surrounding the incident; and

h.    In otherwise negligently, carelessly and recklessly failing to exert that degree of care, caution and diligence as would be demonstrated by a reasonable prudent business owner under the same  or similar circumstances and in otherwise causing the injuries and damages to Plaintiff.

228.  Defendant, Ottava Via, is vicariously liable under the doctrine of respondeat superior for the acts or omissions of any of its agents, contractors, employees or other entities under its ownership or control, including Defendants, Leach, Leach Enterprise, Person and Officers Does.

229.  Defendant's conduct demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

230.  Defendant's conduct demonstrated a willful disregard for substantial risk to Plaintiff.

231.  Defendant breached its duties owed to Plaintiff and was grossly negligent in that the acts committed by Defendant were done with reckless disregard to Plaintiff's safety, health, constitutional and/or statutory rights, and with substantial lack of concern to whether an injury resulted to Plaintiff.

232.   As a direct and proximate of the above-stated breaches of duties by Defendant, Plaintiff has suffered and will continue to suffer damage into the future, including, but not limited to:

  a.   Physical pain and suffering;

  b.   Permanent scarring;

  c.   Mental anguish;

  d.   Severe emotional distress;

  e.   Fright and shock;

  f.   Denial of social pleasures and enjoyments;

  g.   Humiliation or mortification;

  h.   Reasonable medical bills and expenses for past, present and future;

  i.   Punitive damages;

  j.   Exemplary damages; and

  k.   All other damages properly recoverable under law.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in his favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT VIII
## EXPRESS/IMPLIED AGENCY

## (AGAINST DEFENDANT OTTAVA VIA)

233.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

234.   An agent is a person who is authorized by another to act on its behalf.

235.   Defendant, Ottava Via, intentionally and/or negligently made representations that Defendants, Leach, Person and Officers Does, were acting as employees, agents, and/or representatives of Ottava Via.

236.   Plaintiff was injured as a result of Defendants, Leach, Person, and Officers Does violations of his constitutional rights, namely, the use of excessive force, as fully described above.  These acts were performed during the course of the Defendants, Leach, Person and Officers Does' employment, agency and representation with Defendant Ottava Via.

237.   Defendant, Ottava Via, is responsible for the acts and/or omissions of its agents and/or representatives.

238.   As a direct and proximate result of Defendants' violation of Plaintiff's constitutionally-protected rights, Plaintiff has suffered and will continue to suffer damage into the future, including, but not limited to:

a.   Physical pain and suffering;

b.   Permanent scarring;

c.      Mental anguish;

d.      Severe emotional distress;

e.      Fright and shock;

f.      Denial of social pleasures and enjoyments;

g.      Humiliation or mortification;

h.      Reasonable medical bills and expenses for past, present and future;

i.      Punitive damages;

j.      Exemplary damages; and

k.      All other damages properly recoverable under law.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in his favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## **PRAYER FOR RELIEF**

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

A.      compensatory and consequential damages, including damages for physical pain and suffering, emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B.  economic losses on all claims allowed by law;

C.  special damages in an amount to be determined at trial;

D.  punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

E.  attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

F.  pre- and post-judgment interest at the lawful rate; and

G.  any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

Respectfully submitted,

MIKE MORSE LAW FIRM, P.L.L.C.

By:  s/ Jennifer G. Damico
Jennifer G. Damico (P51403)
Attorneys for Plaintiff
24901 Northwestern Highway
Suite 700
Southfield, MI  48075
(248) 350-9050/ fax (248) 281-9110
jdamico@855mikewins.com

July 18, 2018